FLORENCE NIGHTINGALE NURSING
SERVICE, INC., Plaintiff,

v.

BLUE CROSS AND BLUE SHIELD
OF ALABAMA, Defendant.

Civ. A. No. 91–AR–2236–S.

United States District Court,
N.D. Alabama, S.D.

Aug. 26, 1993.

Jay Smith, Samuel H. Heldman, Patrick Fred Clark, Maureen Kane Berg, Cooper Mitch Crawford Kuykendall & Whatley, Birmingham, AL, Steven S. Sesman, Sherman Oaks, CA, for plaintiff.

Michael L. Edwards, Cavender C. Kimble, Balch & Bingham, Birmingham, AL, Charles N. Bland, Bronson Bronson & McKinnon, Los Angeles, CA, for defendant.

## MEMORANDUM OPINION

ACKER, District Judge.

A hyperbolic wag is reputed to have said that E.R.I.S.A. stands for "Everything Ridiculous Imagined Since Adam." This court does not take so dim a view of the Employee Retirement Income Security Act of 1974. Instead, this court is willing to believe that ERISA has lurking somewhere within it a redeeming feature. However, this is not the case in which to find it. Instead, this case turns on mundane, routinely accepted principles offering little grist for the ERISA windmill.

Because ERISA does not permit trial by jury, the case was bench-tried, after which the parties filed comprehensive post-trial briefs. The record is too voluminous to be fully outlined in an opinion. The dispositive facts, as this court finds them, some of which are obviously more important than others, are as follows.

### Findings of Fact

Plaintiff, Florence Nightingale Nursing Service, Inc. (Nightingale), a California entity, provided skilled home nursing care between July 8, 1987 and September 5, 1987, in Ft. Lauderdale, Florida, to Frank Lungarella (Lungarella) who was dying of Acquired Immune Deficiency Syndrome ("AIDS"). Prior to the onset of this horrible and terminal illness, Lungarella had been an employee of Intergraph Corporation (Intergraph) and, as such, was covered by Intergraph's Medical Benefits Plan for Active and Retired Employees (the Plan).

The Plan is governed by ERISA, 29 U.S.C. §§ 1001, *et seq.* Defendant, Blue Cross and Blue Shield of Alabama (Blue Cross), was and is the Claims Administrator for the Plan and in that capacity had the fiduciary responsibility for receiving, processing and paying claims. The Plan is self-funded by Intergraph. Nightingale's standing to sue as Lungarella's assignee of benefits under the Plan is not disputed.

At all times pertinent, the Plan document, which was contained within a folder labeled "Blue Cross" and not "Intergraph," provided that private duty skilled nursing care was a covered benefit to the extent such care was "medically necessary." The Plan did not cover "custodial care" because the Plan did not deem skilled attention in a private home environment "medically necessary." Nightingale billed Blue Cross for services rendered to Lungarella at an hourly rate of $47.50 for the 264 hours of service Nightingale delivered between July 8, 1987 and July 19, 1987, a period during which Lungarella underwent intravenous treatment at home under nursing supervision. Nightingale charged a reduced rate of $42.50 per hour for the 1,132 hours between July 20, 1987, when the intravenous needles ("I.V.'s") were removed, and September 5, 1987, the date of Lungarella's death. The Plan provided that only "reasonable" charges would be paid.

Prior to Nightingale's providing home care to Lungarella, Ms. Warren, Nightingale's owner, telephoned Blue Cross. An ostensibly authorized Blue Cross representative orally assured Ms. Warren that Lungarella's home nursing care was covered. Nightingale would not have provided the service had it not believed, rightly or wrongly, that Blue Cross would reimburse Nightingale at Nightingale's customary hourly rates for nursing AIDS patients, which was its exclusive business. Blue Cross says that it cannot find the letter that it received from Ms. Warren and which she mailed on or about July 9, 1987. The letter confirmed her said telephone conversation. Ms. Warren's letter stated:

FLORENCE NIGHTINGALE NURSING SERVICE
*Specializing in the Care of AIDS Patients*
P.O. Box 27
FT. LAUDERDALE, FL 33302
(305) 390–6544
(818) 362–6078
July 9, 1987

Jan Spradling

Blue Cross—Blue Shield of Alabama

P.O. Box 2504

Burmingham [sic], AL 35201

**1458**

RE: F. Lungarella

Group #: INT 167–32–9299

Dear Ms. Spradling:

This letter is to confirm our telephone conversation of July 7, 1987. You stated that Mr. Lungarella's policy covers Private Duty Nursing. I was told that Mr. Lungarella has met his out of pocket expenses for the year, and that his Private Duty Nursing will be covered at one hundred percent.

A physician's Plan of Treatment, nurses' notes and all skilled documentation must be included in the billing.

Should there be a discrepancy in the policy, please notify me in writing within five days of receipt of this letter.

Sincerely,

/s/

Porter Warren, R.N.
Administrator

Blue Cross never answered Ms. Warren's letter and, until this dispute arose, never indicated what it considered to be a "reasonable" charge if Nightingale's regular and customary charge was not deemed "reasonable," and never signified what home nursing care was or was not "medically necessary."

The Plan defined "charge" as follows:

"Charge" means the reasonable charge by a provider of covered services or supplies not exceeding the provider's actual charge regularly and customarily made for these services or supplies.

The Plan defined "medically necessary" as follows:

"Medically Necessary" means the use of a Hospital or the furnishing of other services or supplies which are necessary to treat a Member's illness or injury. To be Medically Necessary, the services and supplies furnished must (as determined by the Claims Administrator):

be appropriate and necessary for the symptoms, diagnosis or treatment of the Member's condition, disease, ailment, or injury; and

be provided for the diagnosis or direct care of Member's medical condition; and

be in accordance with standards of good medical practice accepted by the organized medical community; and

not be solely for the convenience of the Member, his family, his Physician or another provider of services; and

not be Experimental or Investigative; and

be performed in the least costly setting the Member's medical condition requires.

A "setting" may be the Member's home, a Physician's office, a Participating Ambulatory Surgical Facility, a Hospital's outpatient department, a Hospital when the Member is an inpatient, or another type of facility providing a lesser level of care. Only the Member's medical condition is considered in deciding which setting is Medically Necessary. The financial or family situation of the Member, the distance he lives from the Hospital or other facility, or any other non-medical factor is not considered. As the medical condition of the Member changes, the setting he needs may also change. The Member should inquire of his Physician if any of his services can be performed on an outpatient basis, or in a less costly setting.

The Plan's definition of "usual, customary and reasonable fee," *a definition that, as will appear, clearly does not apply to home nursing services,* was as follows:

"Usual, Customary and Reasonable Fee" (often referred to as "UCR Fee") means the amount of a *Physician's* charge that the Claims Administrator will recognize for payment for his Medically Necessary services covered by this Plan. The amount recognized will not be more than the *Physician's* actual charge. In determining the "UCR Fee" of a Physician, the Claims Administrator considers:

(a) the "usual charge" which is most frequently charged by a particular *Physician* to his patients for the same or a similar service; and

(b) the "customary charge" which is the charge at the ninetieth percentile of the range of usual charges for the same or a similar service billed by most Physicians with similar training and experience

within the geographic area (or in other areas, if it is determined by the Claims Administrator that these [sic] are too few charges for the same or similar service by other Physicians in the same area); or

(c) the "reasonable charge" which is whether the charge otherwise is reasonable in light of all the circumstances, including any unusual circumstances or complications requiring time, skill, or experience additional to that ordinarily required for the services; and

(d) either (a), (b) or (c) for the surgical procedure with the highest fee and one-half of (a), (b) or (c) for each of the other surgical procedures, when two or more surgical procedures are performed during the same operating session.

(emphasis supplied).

After Nightingale billed Blue Cross at $47.50 and $42.50 per hour, Blue Cross responded by reimbursing Nightingale at the rate of $19.00 per hour for the services rendered prior to July 19, 1987, and by paying nothing for the services rendered after July 19, 1987. Blue Cross then took, and still takes, the position that a charge of $47.50, which is obviously substantially in excess of Blue Cross's pre-determined $19.00 per hour for skilled private duty nursing (information that Blue Cross did not share with Nightingale), was not "reasonable." Blue Cross also contends that after the intravenous treatment was discontinued (with Lungarella's concurrence and with the concurrence of his family), he was only under "custodial care" not requiring skilled nursing, during which time Nightingale's home services were no longer "medically necessary." In other words, Blue Cross asserts that Lungarella's family was entirely capable of providing the level of care which the dying man required at home after the "IV's" were removed. However, Lungarella could easily have been sent to a hospital instead of staying at home to die, and the hospital would, in all probability, have been paid under the Plan.

A sworn declaration executed on June 17, 1991, by Cynthia L. Moon, a knowledgeable Blue Cross employee, stated, *inter alia:*

Blue Cross determined that the entire 279 hours of nursing services claimed were reimbursable at the rate of $19.00 per hour. *This rate was determined by Blue Cross to be the regular and customary rate for such services.*

(emphasis supplied). Ms. Moon did not proffer an opinion that Blue Cross's "regular and customary rate" was the *only* "reasonable charge" for the services rendered by Nightingale, or that Nightingale's rate was "unreasonable" considering all of the circumstances. Neither Ms. Moon nor any other Blue Cross employee has ever suggested that Nightingale's invoice to Blue Cross exceeded *Nightingale's* "regular and customary rate."

Blue Cross's rather enigmatic agreement with Intergraph for administering the Plan provided, *inter alia:*

The purpose of this document is to identify the special agreements between Intergraph Corporation and Blue Cross and Blue Shield of Alabama for administration of the health and dental benefit plans of Intergraph Corporation.

\*    \*    \*    \*    \*    \*

IV. *Financial*

1. Administrative Services Contract Only. No reinsurance thru Blue Cross and Blue Shield of Alabama.

2. Weekly deposit with Monthly Settlement. Intergraph will remit a weekly deposit beginning May 1, 1987. These deposits will be used to pay claims during the month. An invoice will be sent to Intergraph monthly for claims paid the previous month, plus the administrative fee. Deposits are credited against claims and a settlement made each month. The weekly deposits are waived from 3/1/87—5/1/87 because of initial claims startup. During these initial months, Intergraph will be invoiced for claims paid plus administrative fee.

\*    \*    \*    \*    \*    \*

5. Notice of cancellation by either party will be done 30 days prior. In the event of cancellation, Blue Cross and Blue Shield of Alabama will process any and all claims incurred prior to cancellation date. All claims runout, including any

1460

applicable hospital retroactive adjustments, will be paid by Blue Cross and Blue Shield and invoiced to Intergraph until these claims are completed.

Weekly Deposit—$93,000.00 (includes health & dental)

Administrative Fee—5.2% of paid claims. Administrative fee is guaranteed to 1–1–89. An extension to 1–1–90 will be guaranteed pending no state or federal mandates have caused Blue Cross and Blue Shield administrative costs to increase. It is understood that if Pre-admission Certification is added at a future date during the period of 3–1–87 to 1–1–90, no increase in administrative fee will be charged because of Pre-admission Certification.

\* \* \* \* \* \*

7. Blue Cross and Blue Shield will perform the following services in exchange for the 5.2% administrative fee:

—Claim control activities, provider pricing information and third-party liability investigation.

\* \* \* \* \* \*

—Cost containment activities ... medical necessity activities.

This document was printed under the logo of Blue Cross and not under the logo of Intergraph. This court can find nothing in the written agreement between Blue Cross and Intergraph informing the two signatories as to which is responsible for the cost of defending a Plan beneficiary's litigated claim.

Although Blue Cross did not undertake to insure or to reinsure Intergraph's obligations under this plan, Blue Cross is itself a very large (if not the largest) Alabama group medical insurer. Blue Cross's own medical insurance plans contain provisions similar, if not identical, to those in this Plan. In fact, Blue Cross's internal guidelines are geared to the interpretation and application of terms and phrases which are not only central to this Plan but to plans designed and insured by Blue Cross. Blue Cross's business is medical insurance. Apparently, Intergraph's Plan was drafted using basically a Blue Cross form.

After Blue Cross refused to pay Nightingale's invoice in full, Nightingale filed this action on December 15, 1989, in the Superior Court of the State of California for the County of Los Angeles. The case was then removed by Blue Cross to the United States District Court for the Central Division of California, and thereafter transferred by that court to this court. One of Blue Cross's first defenses was that Nightingale had failed to exhaust internal administrative remedies provided by the Plan. Therefore, on November 20, 1991, this court dismissed Nightingale's action in recognition of the prerequisite of exhaustion of the Plan's internal review procedures. This dismissal was without prejudice to reinstatement if the review procedure did not produce a result satisfactory to Nightingale. The parties thereafter spent a great deal of time and energy presenting to Reneé Holloway, M.D., who was and is Blue Cross's Assistant Medical Director and chief claims evaluator, the very same issues Nightingale had attempted to present in its original complaint.

On December 2, 1992, present counsel for Blue Cross wrote a letter brief addressed to Dr. Holloway "*C/O Legal Department,* Blue Cross and Blue Shield of Alabama." (emphasis supplied). Intergraph was not resisting Nightingale's claim before the Claims Administrator. Rather, the Claims Administrator's own lawyers were opposing Nightingale before the Claims Administrator, which, in truth and fact, was Blue Cross's legal department. It was an incestuous situation. In "evaluating" the claim, Dr. Holloway did not conduct an oral hearing. Instead, she reviewed written materials submitted both by Nightingale and by Blue Cross. She also considered Blue Cross's internal guidelines and materials on rates obtained *ex parte* by Blue Cross investigators. Before releasing her findings and conclusions, her opinion was edited by Blue Cross's "in-house" counsel, who served as Blue Cross's corporate representative at trial. Except for ordering additional reimbursement for a few hours of what she found to be "medically necessary" private duty nursing after Lungarella stopped receiving intravenous treatment, Dr. Holloway agreed totally with her employer's legal position. Her findings closely tracked the brief

submitted to her by Blue Cross's present counsel. This court still does not understand how she came up with the hours of "medically necessary" nursing after the "IV's" were removed.

At trial Dr. Holloway was the only live witness. She testified that she performed her "review" with instructions which differed from any under which she had ever performed. She had been instructed by Blue Cross's lawyers, who she described as being *her* lawyers, to determine a "reasonable" rate for the "medically necessary" services provided by Nightingale to Lungarella, not in her capacity as Assistant Medical Director of Blue Cross but as if she were an entirely independent judge (analogous to a special master?). In other words, she testified that she was not supposed to decide if Blue Cross's $19.00 per hour rate was "reasonable" or if Nightingale's $47.50 per hour rate was "reasonable" but instead that she was to independently arrive at the "reasonable" rate for these services. Only for the sake of argument, the court will make the assumption that Dr. Holloway started with no preconception or presumption in favor of her employer, Blue Cross. This assumption becomes impossible, however, because Dr. Holloway miraculously arrived precisely at Blue Cross's pre-determined $19.00 per hour as *the* "reasonable" rate, despite the undisputed fact that the said rate was the amount then regularly being paid by Blue Cross for *general* private duty nursing services. Blue Cross had no rate limited to private duty nursing specializing in home care to AIDS patients, a service that, without serious contradiction, is a high-risk enterprise with many unpleasant and unique treatment aspects not confronted in other skilled home care situations. No evidence was presented that anything about AIDS treatment is "average," particularly when mouth and body lesions must be treated while urine and feces are present during long periods of incontinence and despair. All Care, the only other nursing care supplier that exclusively serves AIDS patients and that was checked for its hourly home service rate, charged a rate of $50.00 per hour in 1992. Dr. Holloway totally rejected this figure as being irrelevant, on the ground that it was not a 1987 figure. Except for Nightin-

gale's charge, which Nightingale obviously argues is reasonable, the All Care rate is the only charge for exclusive AIDS nursing services offered into evidence, probably because no other home nursing care services specialize in AIDS care.

Dr. Holloway chose not to believe that Ms. Warren mailed the letter of July 9, 1987, in effect deciding that the letter was an "after-the-fact" forensic invention by Nightingale. This court believes Ms. Warren over Dr. Holloway primarily because if Ms. Warren had wanted to make up something to help Nightingale's case she would have done a better job of it.

Dr. Holloway's training is not only in medicine but in "cost containment." In which of these disciplines she is better trained would be an interesting question with which to spend some time. Giving her the benefit of the doubt, she was assigned an impossible task. If Dr. Holloway had not previously proven her desire to please her employer, she certainly proved it, and her own lack of credibility, by concluding that after the "IV's" were removed the skilled nursing care provided by Nightingale was solely for the convenience of the member and/or of his family (Blue Cross's plan language). This court believes that Lungarella's lesions, infection, fever, incontinence, malnutrition, dehydration and the psychological impact of the situation on the patient and on his family made the presence of skilled nurses far more than a mere "convenience." Dr. Holloway's lack of objectivity, although entirely understandable, is obvious.

### Conclusions of Law

■ This court agrees with the parties that the court has subject matter jurisdiction pursuant to ERISA, has jurisdiction over the parties and that the transfer from California to this court was appropriate.

Blue Cross begins its post-trial brief with this statement:

It is difficult to imagine a more rational, reasonable and good faith administrative review that could have been provided for Plaintiff's claims, given the circumstances. Dr. Holloway gave impartial and thought-

ful consideration to all of the arguments raised by Plaintiff, free from any demonstrable appearance of a conflict of interest. Every conclusion she reached makes sense.

This is an almost perfect example of proof by bold assertion. With this bold, uncritical assertion the court respectfully disagrees, and therein lies the tale.

The court may have been wrong to interrupt this proceeding to require Nightingale to exhaust review procedures required by the Plan. Perhaps this court should have realized from its intimate experience long ago as a lawyer in *Glover v. St. Louis–San Francisco Railway Co.*, 393 U.S. 324, 89 S.Ct. 548, 21 L.Ed.2d 519 (1969), that a party cannot be required to exhaust himself simply for the purpose of exhausting a totally futile administrative remedy. Such a "remedy" is not *real* but is merely a built-in obstacle standing in the way of access to a meaningful and fair-minded forum. However, the "exhaustion" process employed in this case did serve to reinforce this court's belief, formed from the other evidence, that Blue Cross was and is so biased in favor of Intergraph that it negates Blue Cross's contention that its denial of benefits must be reviewed under the "arbitrary and capricious" standard. Anyone who could find on this evidence that Blue Cross was a totally disinterested, impartial third-party evaluator of Nightingale's claims must be considered as naive. Blue Cross argues that because it was compensated only by a percentage of "claims paid," it *cannot* have a conflict-of-interest and *cannot* lack objectivity. Blue Cross claims that the method of payment constitutes *absolute* proof of no bias, unless it proves bias in favor of claimants.

In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court recognized that a decision to deny ERISA benefits is subject to *de novo* judicial review unless the plan expressly gives the fiduciary discretionary authority in the matter of deciding claims. The Supreme Court went on to say:

> Because *we do not rest our decision on the concern for impartiality* that guided the Court of Appeals, see 828 F.2d, at 143–146,

*we need not* distinguish between types of plans or *focus on the motivations of plan administrators and fiduciaries.* Thus, for purposes of actions under § 1132(a)(1)(B), the *de novo* standard of review applies regardless of whether the plan at issue is funded or unfunded and regardless of whether the administrator or fiduciary is operating under a possible or actual conflict-of-interest. Of course *if the benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict-of-interest that conflict must be weighed* ...

*Firestone,* 489 U.S. at 115, 109 S.Ct. at 957 (emphasis supplied). The Eleventh Circuit picked up this theme in *Brown v. Blue Cross & Blue Shield of Alabama,* 898 F.2d 1556 (11th Cir.1990). In *Brown,* the Eleventh Circuit held:

> The *disinterested, impartial decisionmaker deserves the greatest deference.* "Where ... the claimant does not argue or is unable to show that the trustees had a significant conflict-of-interest, we reverse the denial of benefits only if the denial is completely unreasonable." [citation omitted].

*Brown,* 898 F.2d at 1564 (emphasis supplied). The Eleventh Circuit then concluded with this highly relevant holding:

> We emphasize the central theme of our exposition: well-established common-law principles of trusts teach that a *fiduciary operating under a conflict-of-interest* may be entitled to review by the arbitrary and capricious standard for its discretionary decisions as provided in the ERISA plan documents, but *the degree of deference actually exercised in application of the standard will be significantly diminished.* A court should not exercise de novo review, but *the area of discretion to which deference is paid must be confined narrowly to decisions for which a conflicted fiduciary can demonstrate that it is operating exclusively in the interests of the plan participants and beneficiaries.* Even *a conflicted fiduciary should receive deference when it demonstrates that it is exercising discretion among choices which reasonably may be considered to be in the interests of the participants and beneficiaries. The*

*fiduciary, however, should bear the burden of dispelling the notion that its conflict-of-interest has tainted its judgment.* If the fiduciary carries this burden, the party challenging its action may still succeed if the action is arbitrary and capricious by other measures.

*Id.,* at 1568 (emphasis supplied). Blue Cross here makes the same argument it made in *McDaniel v. Blue Cross & Blue Shield of Alabama,* 780 F.Supp. 1363 (S.D.Ala.1992), to which the district court wisely responded:

Plaintiffs argue that the degree of deference should be diminished because Blue Cross' payment of claims directly affects its long term relationship with AAWA. *Blue Cross counters that it is reimbursed for all claims paid and that its fee is calculated based on the percentage of claims paid. Therefore, the argument goes, it is in the interests of Blue Cross to pay claims.*

*The Court notes that it could not possibly be in the best interests of Blue Cross to pay every claim submitted.*

*McDaniel,* 780 F.Supp. at 1365 (emphasis supplied). This court necessarily agrees with the Eleventh Circuit in *Brown* and happens to agree with the court in *McDaniel.* In addition, this court finds that $93,000.00 of Intergraph's money in Blue Cross's bank account, bearing interest, and replenished weekly, provided ample self-interest and a substantial Blue Cross motive for not "exercising discretion among choices which reasonably may be considered to be in the interests of the participants and beneficiaries," to borrow a crucial phrase from *Brown.* Any business would like to have a constant $93,-000.00 to invest. Blue Cross has not borne "the burden of dispelling the notion that its conflict-of-interest tainted its judgment," to borrow another central phrase from *Brown.* This court concludes that the provision for compensating Blue Cross only on a percentage of "claims paid" does not constitute absolute proof of disinterest, but is more likely a disguise. The arrangement looks like a good lawyer's idea of a way to fend off the conflict-of-interest charge. Blue Cross's judgment was tainted. What was apparent to the district judge in *McDaniel* is apparent to this

court. Blue Cross's attempt to hang its hat upon *Bruch* and to reinflate the rapidly evaporating deference due a biased decider is transparent. In the instant case, Intergraph was Blue Cross's customer. Intergraph would cancel this very lucrative contract in the blink of an eye if Blue Cross should ever let its obligation to the beneficiaries outweigh its "cost containment" obligation to Intergraph. Blue Cross is too sophisticated not to know how its bread is buttered.

Blue Cross's conflict-of-interest in this case would be obvious even if the court could overlook the impact and precedential effect of paying more than the *pre-determined* $19.00 per hour for skilled home nursing services would have had on Blue Cross's own insured plans. Nothing could impact Blue Cross more adversely than paying substantially more for treating AIDS patients under the Intergraph plan than it pays under its own medical benefit plans containing identical language. Could anyone doubt that if Blue Cross had paid Nightingale $47.50 with Intergraph's money it would shortly thereafter have had to pay a specialized AIDS nursing service $47.50 out of its own pocket? The overriding loyalty of all loyal Blue Cross employees was, not unexpectedly, to Blue Cross. This was no more than human nature. Employing common sense, then, this court knows that Blue Cross was operating under a not-too-subtle conflict-of-interest. It was as if Intergraph installed a fox to watch its employee's chickens. This finding is made easier by the fact that *Brown* firmly places on Blue Cross the burden of proof on this issue. Blue Cross has not met that burden.

To recapitulate, Blue Cross is not an altruistic enterprise. The "discretion" ostentatiously given Blue Cross as Claims Administrator by Intergraph contained reins, as a practical matter, on Blue Cross as tight as if Intergraph had been handling its own claims. The court has reached this decision based on the evidence and has not depended upon the court's accidental reading of a relevant investigative report which serendipitously ap-

peared in *The Birmingham News* on August 16, 1993.[1]

An interesting question arises regarding whether Blue Cross or Intergraph is picking up the tab for defending this case. Because the contract between Blue Cross and Intergraph does not speak to the question, it will require a side understanding, either written or oral, between Intergraph and Blue Cross to decide who pays the lawyers. If Intergraph is responsible, that fact would constitute yet another piece of evidence to support the proposition that Blue Cross's interest and Intergraph's interest are identical, but it might also make Intergraph an indispensable party defendant under Rule 19, F.R.Civ.P.

In their post-trial briefs, the parties used many pages operating under Blue Cross's hopeful assumption, and under Nightingale's "fall-fact" assumption, that this court should give considerable deference to Blue Cross's and Dr. Holloway's decisions because the Plan grants decisional discretion to Blue Cross, as in *Bruch*. This court finds no purpose to be served in undertaking to decide whether Blue Cross's initial decision, as rubberstamped by Dr. Holloway, represents an abuse of discretion (i.e., was arbitrary and capricious), because to do so would be a redundancy. The court would, in effect, be responding to a hypothetical question. The facts here call for this court to nudge as close to a *de novo* review of the evidence as *Brown* permits, and here the gap is so narrow as to be almost imperceptible.[2]

The parties have also spent considerable time debating Nightingale's estoppel theory based on pre-certification telephone conversations and *Kane v. Aetna Life Ins.*, 893 F.2d 1283 (11th Cir.1990). *Kane* requires the court to find a plan document ambiguous before looking to promises outside the plan document for any clarification upon which a party can rely. This court respectfully declines to utter *dictum* on this subject any more than on the question of whether or not Blue Cross abused its discretion. Instead, this court has arrived at its ultimate conclusion of liability in favor of plaintiff and against defendant by giving very little deference to Blue Cross's decision in light of the conflict-of-interest with which it was afflicted and could not shed, and by a finding on the credible evidence that Blue Cross and Dr. Holloway were simply wrong on the facts and law to deny Nightingale's claim.

■ By paying $19.00 per hour while the intravenous tubes were sustaining Lungarella, Blue Cross conceded that skilled home nursing services were "medically necessary" before those tubes were removed. Therefore, the only factual dispute to be resolved during this abbreviated period is whether Nightingale's charges were "reasonable" for the services rendered during that period. The slippery word "reasonable," as used here to describe a bill or a charge, does not contemplate that there can be only one "reasonable" charge for the particular service or item furnished. "Reasonable" means "con-

1. Blue Cross and Blue Shield is the largest and oldest health insurance organization in the United States, with more than 100 million subscribers.

\* \* \*

Although the Blue Cross plans are supposed to be non-profit, [Senator] Nunn['s] committee reports talk of a "corporate culture" in which executives operated their plans as if they were Fortune 500 companies.

\* \* \*

Traditionally, Blue Cross plans collected premiums from policyholders and paid doctor and hospital bills. Their premium levels were expected to remain lower than for-profit companies, thanks primarily to tax exemptions bestowed on Blue Cross plans.

But as medical costs began to increase nationwide, Blue Cross officials in some jurisdictions looked for new lines of business, apparently hop-

ing to augment the income they received from policyholders.

\* \* \*

But Princeton University professor of health policy Donald W. Light is blunt in his assessment.

"By their own choice, Blue Cross plans no longer serve any significant public function," he wrote, calling them "commercial companies in the guise of public interest, non-profit institutions. . . .

Their self-perpetuating boards exhibit a striking lack of stewardship and public responsibility."

Sheila Grissett, *Several Blue Cross Plans in Failing Health*, The Birmingham News, Aug. 16, 1993, at 1G.

2. *See also Doe v. Group Hospitalization and Medical Services*, 3 F.3d 80 (4th Cir.1993).

formable to reason," or "rational," or "honest," or "not excessive," or "not arbitrary." More than one charge for the very same service could, in theory and in fact, be "reasonable." In this case, because of the considerable disparity between $19.00 and $47.50, and because each party seems to argue that only *its* hourly rate is "reasonable," the court is faced with a choice between $19.00 and $47.50. For the court simply to split the difference or to compromise somewhere between the two advocated figures might be arbitrary. Because All Care charged $50.00 per hour for similar specialized services in 1992, even though undoubtedly inflation had raised All Care's rates somewhat from those it charged in 1987, this court concludes that the $47.50 per hour charged by Nightingale while "IV's" were in place was not only Nightingale's "regular and customary" rate but was "reasonable" and, therefore, was due to be paid. Blue Cross's $19.00 pre-determined rate contained no recognition of the highly specialized and risky nature of home service to AIDS patients; however, it is *reasonable* to assume that there is a *reason* for a considerable differential between the cost of routine skilled home nursing service and the cost for nursing AIDS patients. To recruit nurses for treating AIDS victims must be like recruiting kamikaze pilots. It takes a special breed.

■ There is another method of analysis for determining the "reasonableness" issue. However, the court is lead to the same conclusion. Starting with the dubious premise that some deference is due Blue Cross in determining whether Nightingale's charge was reasonable, that deference is offset, and perhaps more than offset, by the Alabama rule of contract construction which construes imprecise language in an insurance contract against the insurer-draftsman and in favor of the insured. The Eleventh Circuit in *Jordan v. National Accident Ins. Underwriters, Inc.*, 922 F.2d 732 (11th Cir.1991), recognized this Alabama doctrine with the following language:

Alabama courts construe ambiguous insurance policies "liberally in favor of the insured and strictly against the insurance company." *Champion Ins. Co. v. Wilkins*, 544 So.2d 965, 967 (Ala.1989), citing *Ho Brothers Restaurant, Inc. v. Aetna Casualty and Surety Co.*, 492 So.2d 603, 605 (Ala.1986).

This is an ambiguous policy because it does not define the terms that set out the limits of coverage. The cases cited by both parties ... illustrate the variety of interpretations that courts have given to "pilot," "passenger," "member of the crew" and other key terms in the policy. Some of these courts have adopted the moment of impact test in construing these terms, *see e.g. Vander Laan [v. Educators Mutual Ins. Co.*, 356 Mich. 318, 97 N.W.2d 6 (1959) ], while others have rejected it, *see e.g. Beckwith [v. American Home Assurance Co.*, 565 F.Supp. 458 (1983) ]. As we said in another case in which we were called on to interpret an ambiguous policy provision in light of conflicting case law, "[u]nder Alabama law, if an insurance contract provision is subject to more than one interpretation, it should be construed in favor of coverage, and against the insurer." *Colbert County Hospital Board v. Bellefonte Ins. Co.*, 725 F.2d 651, 654 (11th Cir.1984).

Faced with the ambiguity created by the conflicting case law, Reliable could have limited coverage by defining the key terms in the policy so as to expressly rule out the moment of impact test. It could have defined "pilot" as "any person who operates any flight control at any time during the flight in question," but it did not. It now asks us to read this definition into the policy. This we cannot do in light of Alabama law's strong policy requiring that ambiguous insurance policies be construed against the insurer. *See Champion*, 544 So.2d at 967.

*Jordan*, 922 F.2d at 734–35 (footnotes omitted). Here Intergraph–Blue Cross could have defined "reasonable charge" as "the rate being paid regularly and customarily by Blue Cross for similar services in Alabama." Instead, the Plan does not define "reasonable charge" for nursing services but does enigmatically define "charge" as

the *reasonable* charge by a provider of covered services or supplies not exceeding

the provider's *actual* charge *regularly and customarily made for these services or supplies.*

(emphasis supplied). Construing this language in favor of Lungarella–Nightingale and against Intergraph–Blue Cross, this court finds that Nightingale's $47.50 charge was not only no greater than its actual, regular and customary charge but was reasonable.

As far as the choice of language is concerned, Blue Cross could have anticipated the adverse financial impact that a flood of high cost AIDS claims would have. Blue Cross could have done what the medical benefits insurer did in *McGann v. H & H Music Co.*, 946 F.2d 401 (5th Cir.1991), namely, amend the Plan to severely limit its exposure to AIDS claims. However, Intergraph–Blue Cross did not choose this course of action. If Intergraph–Blue Cross should win this case, it could accomplish indirectly what the insurer accomplished directly in *McGann.*

On the other hand, if Intergraph–Blue Cross had written the Plan to say, "We'll pay only what *we* deem reasonable," the Plan would undoubtedly not have been well received by Intergraph's employees. The agreement might not even have qualified as an ERISA plan. Yet, this is the interpretation Blue Cross seems to want to give the language.

■ The second ultimate mixed question of fact and law is whether skilled nursing was "medically necessary" after the removal of the "IV's." Although a court cannot allow itself to be swayed by sympathy, it can be influenced by practicality and by how the real world works. A caring family can and should provide loving care for a dying family member like Lungarella, even when that dying member has a dread disease which is highly contagious and very messy. Strangely, eventually, even Dr. Holloway conceded that some skilled nursing was "medically necessary" after the "IV's" were removed. As previously stated, this court finds it hard to understand exactly how Dr. Holloway arrived at the amount of additional reimbursement. Perhaps Blue Cross sought to appear to be fair. As a practical matter, however, when was the Lungarella family supposed to call

for nurses? Dr. Holloway did not say. Not only Lungarella, as the dying patient, but his family, needed the comfort and sense of support which comes automatically with the physical presence of trained nurses. The joint decision of Lungarella and his family to remove the "IV's" was a rational decision; however, the family's decision would appear irrational had they, at that time, understood that the change would automatically cut off reimbursement for skilled nursing.

■ If $47.50 per hour was "reasonable" compensation for AIDS nurses responsible for "IV" introduction and monitoring, as this court has found to be true, the $42.50 charged for 1,132 hours of service rendered after the "IV's" were removed was likewise "reasonable." The terms "reasonable" and "medically necessary" are just as capable of being understood and applied by a layman such as this court as by a supplier-provider, a medical doctor or a "cost container." They are words which must be understood and applied under particular and often varying circumstances. In 1987, the AIDS plague was not as widespread as it is today and was probably less understood. This court is not prepared to say, as Blue Cross seems to be saying, that Nightingale was a charlatan company, seeking to exploit the AIDS plague for its financial aggrandizement. This court is not being asked to judge the relative rectitude of Nightingale and Blue Cross and does not mean to do so. Both plaintiff and defendant are in business to make money. Strictly on the evidence before the court, the court has concluded that Nightingale's charges *were* "reasonable" and *were* "medically necessary." Therefore, Blue Cross's sharply reduced reimbursement and its contention that most of Nightingale's services were not "medically necessary" constituted breaches of the Plan contract.

Perhaps the court has inadvertently done Blue Cross a favor. By the terms of Blue Cross's written agreement with Intergraph, Intergraph will refund Blue Cross all of the judgment which will be entered contemporaneously with this opinion, plus 5.2% for a "claim paid." Perhaps, also, the court was premature in starting this opinion with the

comment that this case will provide no grist for the ERISA windmill, which grinds on.

An appropriate, separate judgment will be entered.