41 F.3d 1476
 18 Employee Benefits Cas. 2732
 FLORENCE NIGHTINGALE NURSING SERVICE, INC., California
corporation, Plaintiff-Appellee,
v.
BLUE CROSS/BLUE SHIELD OF ALABAMA, Defendant-Appellant.
FLORENCE NIGHTINGALE NURSING SERVICE, INC., California
corporation, Plaintiff-Appellant,
v.
BLUE CROSS/BLUE SHIELD OF ALABAMA, Defendant-Appellee.
 Nos. 93-6867, 93-6918.
 United States Court of Appeals,
Eleventh Circuit.
 Jan. 9, 1995.
 
 Cavender C. Kimble, Michael L. Edwards, Balch & Bingham, Birmingham, AL, for appellant in no. 93-6867.
 Maureen Kane Berg, Patrick F. Clark, Samuel H. Heldman, Cooper, Mitch, Crawford, Kuykendall & Whatley, Birmingham, AL, for appellee in no. 93-6867.
 Maureen Kane Berg, Jay Smith, Samuel H. Heldman, Patrick F. Clark, Cooper, Mitch, Crawford, Kuykendall & Whatley, Birmingham, AL, for appellant in no. 93-6918.
 Cavender C. Kimble, Michael L. Edwards, Leigh Ann Hodge, Birmingham, AL, for appellee in no. 93-6918.
 Appeals from the United States District Court for the Northern District of Alabama.
 Before KRAVITCH and DUBINA, Circuit Judges, and GIBSON*, Senior Circuit Judge.
 DUBINA, Circuit Judge:
 
 
 1
 In Case No. 93-6867, Blue Cross/Blue Shield of Alabama ("Blue Cross") appeals the district court's judgment entered in favor of Florence Nightingale Nursing Service, Inc. ("Nightingale") in this ERISA/insurance benefits action. 832 F.Supp. 1456. Based upon our review of the record, we affirm. In a companion case, Case No. 93-6918, Nightingale appeals the district court's order denying its motion for attorney's fees in its suit against Blue Cross. Because we hold that the district court did not abuse its discretion in denying Nightingale's motion for attorney's fees, we also affirm the district court's judgment in that case.[1]
 
 I. BACKGROUND
 
 2
 Nightingale provided skilled home nursing care between July 8, 1987, and September 5, 1987, in Fort Lauderdale, Florida, to Frank Lungarella ("Lungarella"), who was in the later stages of the AIDS virus. Prior to the onset of his illness, Lungarella was an employee of Intergraph Corporation ("Intergraph") and, as such, was covered by Intergraph's Medical Benefits Plan for Active and Retired Employees ("the Plan"). The Plan is governed by ERISA (Employee Retirement Income Security Act), 29 U.S.C. Sec. 1001, et seq. Blue Cross was and is the claims administrator for the Plan and, in that capacity, had the fiduciary responsibility for receiving, processing, and paying claims. The Plan is self-funded by Intergraph.[2]
 
 
 3
 The Plan document provided that private duty skilled nursing care was a covered benefit to the extent such care was "medically necessary." The Plan did not cover "custodial care" because the Plan did not deem skilled nursing in a private home environment "medically necessary." Nightingale billed Blue Cross for services rendered to Lungarella at an hourly rate of $47.50 for the 268 hours of service between July 8, 1987, and July 19, 1987, a period during which Lungarella underwent intravenous ("IV") treatment at home under nursing supervision. Nightingale charged a reduced rate of $42.50 per hour for the 1,132 hours between July 20, 1987, when the IV was removed, and September 5, 1987, the date of Lungarella's death. The Plan provided that only "reasonable" charges would be paid.
 
 
 4
 After a non-jury trial, the district court found that prior to providing home care to Lungarella, Ms. Warren, Nightingale's owner, telephoned Blue Cross. A Blue Cross representative orally assured her that Lungarella's home care was covered. Warren mailed a letter confirming her telephone conversation with the Blue Cross representative. Nightingale produced a copy of this letter at trial; Blue Cross said that it could not find its copy. The letter stated that Nightingale's understanding was that it would be reimbursed 100% for the private duty nursing, and that if this understanding was inaccurate, Blue Cross should notify Nightingale within five days. Warren never received a response from Blue Cross to her letter.
 
 
 5
 Until this dispute arose, Blue Cross never told Nightingale what it would consider to be a "reasonable" charge if Nightingale's regular and customary charge was not deemed "reasonable," nor did it indicate what home nursing care was or was not "medically necessary." The Plan defines "charge" as follows:
 
 
 6
 Charge means the reasonable charge by a provider of covered services or supplies not exceeding the provider's actual charge regularly and customarily made for these services or supplies.
 
 
 7
 The Plan defines "medically necessary" as follows:
 
 
 8
 Medically Necessary means the use of a Hospital or the furnishing of other services or supplies which are necessary to treat a Member's illness or injury. To be Medically Necessary, the services and supplies furnished must (as determined by the claims administrator):
 
 
 9
 be appropriate and necessary for the symptoms, diagnosis, or treatment of the Member's condition, disease, ailment, or injury; and
 
 
 10
 be provided for the diagnosis or direct care of Member's medical condition; and
 
 
 11
 be in accordance with standards of good medical practice accepted by the organized medical community; and
 
 
 12
 not be solely for the convenience of the Member, his family, his Physician or another provider of services; and
 
 
 13
 not be Experimental or Investigative; and
 
 
 14
 be performed in the least costly setting the Member's medical condition requires.
 
 
 15
 A "setting" may be a Member's home....
 
 
 16
 After Nightingale billed Blue Cross at $47.50 and $42.50 per hour, Blue Cross responded by reimbursing Nightingale at the rate of $19.00 per hour for the services rendered prior to July 19, 1987 (IV care), and by paying nothing for the services rendered after July 19, 1987 (after the IV was discontinued). Blue Cross posits that a charge of $47.50, which is obviously substantially in excess of Blue Cross's pre-determined $19.00 per hour for skilled private duty nursing, is not "reasonable." Blue Cross also contends that after the IV was discontinued, Lungarella was only under "custodial care" not requiring skilled nursing, during which time Nightingale's services were no longer "medically necessary." Essentially, Blue Cross maintains that Lungarella's family was capable of providing all of the care he needed after the IV's were removed.
 
 
 17
 After Blue Cross refused to pay Nightingale's invoice in full, Nightingale filed suit in the Superior Court of the State of California. Blue Cross removed the case to the United States District Court for the Central Division of California. That court subsequently transferred the case to the Northern District of Alabama. One of Blue Cross's first defenses was that Nightingale had failed to exhaust internal administrative remedies available under the Plan. Accordingly, the district court dismissed the action without prejudice in order that Nightingale might seek an internal administrative remedy.
 
 
 18
 The parties then presented their contentions to Dr. Renee Holloway ("Holloway"), who was and is Blue Cross's Assistant Medical Director and chief claims evaluator. The irony here is that Blue Cross's own legal department was opposing Nightingale in front of Holloway, Blue Cross's claims evaluator.[3] Holloway did not conduct an oral hearing, choosing instead to rely on written documentation. She also considered Blue Cross's internal guidelines and material regarding nursing rates obtained ex parte by Blue Cross investigators. Before Holloway released her findings, Blue Cross's in-house counsel edited her opinion. This in-house counsel later served as Blue Cross's corporate representative at trial. Except for ordering additional reimbursement for a few hours of what she found to be "medically necessary" private duty nursing following the extraction of the IV, Holloway agreed completely with Blue Cross's initial evaluation of the case.
 
 
 19
 After Holloway made her findings, Nightingale again filed suit in the district court. The district court conducted a bench trial and entered findings in favor of Nightingale. The district court ordered full reimbursement for Nightingale's services, along with substantial prejudgment interest. Blue Cross then perfected its appeal (Case No. 93-6867).
 
 
 20
 After the district court entered its judgment, Nightingale filed a petition for attorney's fees and expenses pursuant to ERISA's Sec. 502(g)(1), 29 U.S.C. Sec. 1132(g)(1). The petition was timely filed and included all necessary supporting documentation. The district court denied the request for a fee award. Nightingale then perfected its appeal (Case No. 93-6918).
 
 II. ISSUES
 
 21
 In Case No. 93-6867, Blue Cross presents the following issues for review:
 
 
 22
 (1) Whether the district court improperly applied heightened scrutiny under the arbitrary and capricious standard in reviewing Blue Cross's administrative decision.
 
 
 23
 (2) Whether the district court erred as a matter of law by not upholding Holloway's decision that $19 per hour was the reasonable charge for care rendered during July 8--July 20, 1987.
 
 
 24
 (3) Whether the district court erred in holding that the post-July 20 care was medically necessary.
 
 
 25
 (4) Whether the district court abused its discretion in applying Alabama's insurance interest statute in awarding prejudgment interest.
 
 
 26
 In Case No. 93-6918, Nightingale contends that the district court erred in denying its motion for attorney's fees without first affording Nightingale an opportunity to be heard and, in denying the motion for attorney's fees, the district court applied an erroneous legal standard.
 
 III. DISCUSSION
 Case No. 93-6867
 
 27
 A. Standard of Review Used by the District Court
 
 
 28
 Blue Cross first takes issue with the district court's decision not to apply the deferential arbitrary and capricious standard of review. In deciding this case, the threshold question for the district court was the proper standard of review to apply to Blue Cross's denial of Lungarella's claim. The Supreme Court has held that, as a general matter, courts should review claims administrators' denials of ERISA benefits under a de novo standard. Firestone v. Bruch, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In Firestone, the Court held that the arbitrary and capricious standard of review is often too lenient in that it "would afford less protection to employees and their beneficiaries than they enjoyed before ERISA was enacted." Id. at 113-14, 109 S.Ct. at 956 (citations omitted).
 
 
 29
 The Firestone decision provided for the use of the arbitrary and capricious standard only in the specific case where the plan document explicitly vests the claims administrator with discretion to "construe disputed or doubtful terms." Id. at 111, 109 S.Ct. at 954. However, deference in such situations is greatly diminished when the claims administrator is acting under a conflict of interest. Id. at 115, 109 S.Ct. at 957. This court has held that when a conflict of interest is apparent, "the burden shifts to the fiduciary to prove that its interpretation of plan provisions committed to its discretion was not tainted by self-interest." Brown v. Blue Cross & Blue Shield of Alabama, Inc., 898 F.2d 1556, 1566 (11th Cir.1990) (citations omitted), cert. denied, 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991).
 
 
 30
 In addition, this court recently delineated the analysis to be used in deciding cases like the present. See Lee v. Blue Cross/Blue Shield of Alabama, 10 F.3d 1547, 1549-52 (11th Cir.1994). First, a court must establish whether the claimant has proposed a "reasonable" interpretation of the plan under which he could be covered. Id. at 1550. If the plan grants the claims administrator discretion to interpret disputed provisions, however, the next step is to consider whether the claims administrator's interpretation was arbitrary and capricious. Id. at 1550. If the claimant has established a reasonable interpretation, then under contra proferentem, which requires ambiguities to be construed against the drafter of a document, the claimant's interpretation is taken as correct. Id. at 1551.[4] Where no conflict of interest is present, a claims administrator's wrong but reasonable interpretation will not be found arbitrary and capricious. Id. at 1550. However, if a conflict of interest is established, the burden shifts to the administrator to prove that his or her interpretation of the plan was not tainted by self-interest. Id.
 
 
 31
 In the present case, the district court heard the testimony of Holloway and spent a significant amount of time considering the possibility of a conflict of interest. The district court chose to discount Holloway's evaluation and subsequent testimony due to a number of conflicts. The first conflict noted by the district court was Blue Cross's desire to maintain its business relationship with the employer-insurer. Holloway's testimony established that Intergraph is Blue Cross's customer; that Intergraph pays Blue Cross fees for its services; and that Blue Cross likes to please its customers. RIII-74-39, 40. Holloway further testified that she understood that Intergraph could fire Blue Cross at any time for any reason. Id. at 44. The district court noted that each week Intergraph deposits $93,000 with Blue Cross and stated that this provided ample self-interest for Blue Cross to please Intergraph.
 
 
 32
 The second conflict found by the district court was Blue Cross's strong pecuniary interest in the narrow interpretation of the relevant provisions of the Plan. Holloway testified that it did not matter whether Blue Cross was the insurer or whether an employer is the actual insurer because if two different plans have exactly the same provision, she would interpret it the same way in both plans. RIII-74-47. Thus, Blue Cross's obligation to interpret contracts consistently means that the precedential effect of this decision would affect innumerable contracts that Blue Cross insures containing identical language. Accordingly, the district court found that Blue Cross is not an unbiased decision-maker when it interprets these provisions.
 
 
 33
 The third conflict found by the district court was that when the claims administrator rendered her administrative decision in this case, the claims administrator was fully aware that her employer had already engaged in two years of litigation in which it was fighting to deny this claim. This is evidenced by some procedural irregularities in Holloway's processing of the claim. Holloway's task was explained to her by a Blue Cross attorney from its in-house legal department who was intimately involved in advocating Blue Cross's position throughout this litigation. RIII-74, 54-55. This lawyer also assisted Holloway in editing her administrative opinion. RIV-74-287, 288.
 
 
 34
 Suffice it to say that our review of the record persuades us that there is ample evidence to support the district court's findings of a conflict of interest. We decline to overturn these findings because they are not clearly erroneous. See Pullman-Standard v. Swint, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982).
 
 
 35
 Moreover, we are unimpressed with Blue Cross's argument on appeal; the mere fact that Blue Cross is compensated only for claims that it pays, as opposed to claims that it denies, like the one at issue here, cannot be used as an all-powerful talisman to ward off any possible conflict of interest charge. Certainly, in a case like this, in which the supposedly objective claims administrator is taking ex parte advice from the lawyer who is representing Blue Cross in front of her, Blue Cross's reliance on its fee arrangement with Intergraph as its sole response to the charge of conflict of interest is rightly discounted.
 
 
 36
 In sum, we hold that Blue Cross is not entitled to the deferential arbitrary and capricious standard of review. It is Blue Cross's burden to prove that its decision is not tainted by self-interest and Blue Cross has failed to meet its burden.
 
 B. Reasonable charge
 
 37
 Blue Cross contests the district court's finding that Nightingale's rate of $47.50 per hour, during the time that Lungarella had an IV, was reasonable. Blue Cross maintains that its settled rate of $19.00 per hour for private duty nursing is, in fact, the reasonable rate and that the district court erred as a matter of law in not upholding it. Blue Cross relies heavily upon survey data detailing the rates charged for private duty nursing in the summer of 1987 in Lungarella's geographic location. A Blue Cross representative conducted a survey in which seven nursing service agencies responded. All services stated that they treated AIDS patients in their homes without charging extra for the service. The survey rates ranged from $13.50 to $27.00 per hour. Thus, Blue Cross argues that its $19.00 figure falls squarely in the middle.
 
 
 38
 The district court elected to discount Blue Cross's survey and chose to rely on the affidavit of Warren, describing customary charges for treating AIDS patients and the 1992 rates of All Care, the only other agency in the area which treated AIDS patients exclusively. There is sufficient evidence in the record to support the district court's findings.
 
 
 39
 First, the survey conducted by Blue Cross was totally bereft of statistical significance, as Holloway admitted in her administrative decision. RII-55-10, RII-63-Tabs 6, 10. Second, the failure of the Blue Cross study to focus on nursing agencies that actually provide substantial services to AIDS patients is fatal to its reliability. Third, Warren offered inherently credible testimony that it costs more to find nurses willing to work primarily with AIDS patients, and that other nursing agencies regularly referred AIDS cases to Nightingale. Warren Dep. at 227, 230. Fourth, Warren testified that her rates were the going rates in the Ft. Lauderdale area in 1987 for private duty nursing for AIDS patients. RII-63-Tab 13-para. 6 at 3. Warren provided Blue Cross with the names of two AIDS-specialized nursing agencies in the Ft. Lauderdale area which she said had similar rates--All Care and High Tech. RII-55-8. The Blue Cross representative did not contact either of these agencies when she did her survey. Finally, in 1992, when Holloway was conducting her administrative review, she attempted for the first time to contact these agencies. She could not reach High Tech, but was able to make a rate inquiry of All Care. RIII-74-96, 97. All Care's 1987 rates were in the archives, but the service informed Holloway that its current rates for private duty nursing service were $50.00 per hour for nursing care with IV, and $42.00 per hour otherwise. Id. at 97. Since both of these nursing services specialized in the treatment of AIDS patients and billed at similar rates, the All Care rates provided credible evidence supporting the reasonableness of Nightingale's rates.
 
 
 40
 Additionally, Nightingale's interpretation of the provisions in the Plan governing the rate to be paid was reasonable and correct. As previously noted, "charge" is defined in the Plan as the reasonable charge by a provider of covered services or supplies not exceeding the provider's actual charge regularly and customarily made for these services and supplies. RII-63-Tab 1-Sec. I.5. at 1. Thus, the "charge by a provider" is limited to two concepts: it must be reasonable; and it may not exceed the fee that the provider "regularly and customarily" charges for the specific service. The record supports the district court's finding that Nightingale's $47.50 and $42.50 rates were "regular and customary." The rates charged by Nightingale in this case are the same that it charges all of its patients--it is Nightingale's "regular and customary" charge.
 
 
 41
 The district court correctly determined that Blue Cross's alternate reading of the "charge" language is not reasonable. In denying Nightingale's rates and substituting its own rate, Blue Cross relied on a pre-determined rate for private duty nursing. RIII-74-93, 76, 77. The Plan, however, makes no reference to a pre-determined rate in the definition of "charge." The Plan requires analysis of the provider's rate. Holloway testified at trial that she understood that she was to determine if the $19.00 rate was reasonable. RIII-74-99,100. This is an incorrect analysis. Holloway determined whether Blue Cross's pre-determined fee of $19.00 was reasonable, not whether the provider's fee was reasonable. Accordingly, the district court's holding as to the reasonable rate was not in error.
 
 C. Medically Necessary
 
 42
 The district court determined that the care Nightingale rendered to Lungarella from July 20 until September 5, 1987, was "medically necessary" under the Plan definition. Blue Cross contends that the district court erred in its determination. We disagree.
 
 
 43
 The record demonstrates that the Nightingale nurses provided a variety of services during the last seven weeks of Lungarella's life that were essential to prolonging his life and maintaining its best possible quality as he suffered through the final days of his illness. The nurses provided care relating to Lungarella's outbreaks of herpes lesions on his coccyx. This care was especially important with Lungarella because AIDS patients experience incontinence of urine and feces and if not cleaned and treated can increase the risk of infection. The proximity of the lesions to the sources of incontinence dictated rapid response. RIII-74-123-125, 130-134, 139-140. The nurses also monitored numerous indicators of Lungarella's health and filled out complex charts daily. The nurses were also prepared for emergencies. Lungarella had many sores on his mouth and tongue which made it difficult to eat and breathe. The nurses were present to deal with crises as they might arise; i.e., to clear his breathing tubes if they became clogged. The nurses also provided trained support for the numerous psychological problems associated with AIDS. As such, the district court correctly determined that the care Lungarella received in the last seven weeks of his life was "medically necessary."
 
 
 44
 Since Nightingale offered a reasonable interpretation of the "medically necessary" provision under which the care would be covered, according to Lee v. Blue Cross/Blue Shield of Alabama, 10 F.3d 1547 (11th Cir.1994), Blue Cross must offer a reasonable interpretation under which the care would not be covered and prove its denial of the claim was not tainted by self-interest. Blue Cross has done neither. Holloway analyzed "medically necessary" under separate guidelines contained in another Blue Cross document that is not even mentioned in the Plan. RII-55-15, 16. These separate guidelines are contained in the "Pre-certification of Private Duty Nursing Policy." RII-63-Tab 8. This Pre-certification Policy enunciates a different definition of "medically necessary" than the one contained in the Plan. Holloway imported an additional requirement from the Pre-certification definition of "medically necessary" and injected it into her analysis. A claims administrator's decision is arbitrary and capricious where new requirements for coverage are added to those enumerated in the plan. See Helms v. Monsanto Company, Inc., 728 F.2d 1416, 1420 (11th Cir.1984) (holding a claims administrator's denial of disability benefits was arbitrary and capricious where he read a requirement of "no conscious life" into a plan definition of "total disability"). Holloway admittedly never actually analyzed the elements of "medically necessary" that are listed in the Plan. RIII-74-159, 160. Accordingly, Holloway's decision was arbitrary and capricious, and the district court correctly determined that Holloway's decision was incorrect.
 
 D. Prejudgment Interest
 
 45
 After finding for Nightingale at trial, the district court awarded prejudgment interest in the amount of 1.5% per month. In computing the interest rate, the district court consulted Ala.Code Sec. 27-1-17(b) (1986), which provides the rate of interest to be paid by an insurer to an insured if a claim has been denied for invalid reasons. Blue Cross contends that this reliance was in error and that if interest was to be assessed at all, the district court should have applied Alabama's statutory interest rate of 6% per year. Blue Cross presents three arguments in support of its contention that the district court abused its discretion in awarding 1.5% monthly (18% annually) in prejudgment interest: (1) the insurance interest statute is preempted as to self-funded plans; (2) Blue Cross is exempted from the insurance interest statute; and (3) an award of interest to the provider and not to the insured violates the express terms of the statute. None of these arguments persuades us that the district court erred in awarding prejudgment interest.
 
 
 46
 The award of an amount of prejudgment interest in an ERISA case is a matter "committed to the sound discretion of the trial court." Moon v. American Home Assurance Co., 888 F.2d 86, 89-90 (11th Cir.1989). It was clearly within the district court's discretion to use Sec. 27-1-17(b) as an analogy to fill a gap in ERISA law. The district court noted:
 
 
 47
 Whether Sec. 27-1-17(b) is applied as a matter of Alabama law enforceable against Alabama health insurers like Intergraph or as a matter of federal common law arrived at by analogy, this court concludes that 1.5% per month is the proper interest rate to be applied in this case.
 
 
 48
 We see no abuse of discretion in this finding. Furthermore, Blue Cross's argument is contradictory: why would Alabama's statutory interest rate of 6% not also be preempted? Additionally, this court applied the Alabama interest statute in question in another insurance/ERISA case, Jordan v. National Accident Ins. Underwriters, Inc., 922 F.2d 732 (11th Cir.1991), certified answer conformed to, 948 F.2d 1218 (11th Cir.1991), but the court did so by declining to address the ERISA preemption issue.
 
 
 49
 Blue Cross's second argument that it is exempted from the insurance interest statute because it is not an insurance company is specious. The district court correctly found that as Intergraph's administrator, Blue Cross stood in the shoes of Intergraph and thus could not cloak Intergraph with immunity from the interest requirements by claiming exemption.
 
 
 50
 Blue Cross's last argument that an award of interest violates the express terms of the statute because the statute notes interest is to be paid by the insurer to the insured is also meritless. Blue Cross argues that Nightingale is the provider of the services, not the insured, and thus cannot be awarded interest because the Alabama Legislature clearly intended such awards to insureds, not providers. We think the more likely scenario, however, is that the legislature intended the interest provision to deter insurance companies from denying reimbursement without cause.
 
 
 51
 In conclusion, we affirm the judgment of the district court in Case No. 93-6867.Case No. 93-6918
 
 
 52
 Nightingale argues that the district court erred in denying its petition for attorney's fees. A denial of a petition for attorney's fees is reviewed for an abuse of discretion. Freeman v. Continental Ins. Co., 996 F.2d 1116, 1118 (11th Cir.1993); Dixon v. Seafarers' Welfare Plan, 878 F.2d 1411, 1412 (11th Cir.1989).
 
 
 53
 Nightingale first contends that the district court erred in denying its petition for attorney's fees without a hearing, or at least, without a response from Blue Cross. Our circuit has made clear that district courts are not required to hold a hearing on the fee issue. "It is perfectly proper to award attorney's fees based solely on the affidavits in the record." Norman v. Housing Authority of City of Montgomery, 836 F.2d 1292, 1303 (11th Cir.1988). However, we have noted that evidentiary hearings are occasionally necessary
 
 
 54
 where an evidentiary hearing was requested, where there were disputes of fact, and where the written record was not sufficiently clear to allow the trial court to resolve the disputes of fact....
 
 Id. This court has also instructed that
 
 55
 [a] district court should give the applicant an adequate opportunity to respond to the court's concerns regarding the fee application and to correct perceived inadequacies in that application before making its decision. This is particularly necessary in the situation when the fee application is unopposed.
 
 
 56
 N.A.A.C.P. v. City of Evergreen, Alabama, 812 F.2d 1332, 1338 (11th Cir.1987). An evidentiary hearing was not necessary in this case because the district court had intimate knowledge of the case and received very detailed affidavits from Nightingale.
 
 
 57
 Nightingale's second argument is that the district court misapplied the law when it denied the petition for attorney's fees. Our court has enumerated five factors for the district courts to consider when deciding a motion for attorney's fees: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorney's fees; (3) whether an award of attorney's fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions. Freeman v. Continental Ins. Co., 996 F.2d 1116, 1119 (11th Cir.1993). In Freeman, we did not dictate that district courts discuss each factor.
 
 
 58
 The district court considered all of the Freeman factors it felt were "apropos." RII-88-4. The district court only discussed the first factor--bad faith. The district court found that Blue Cross had not acted in bad faith because it clearly had an arguable basis for its decision. See Armistead v. Vernitron Corp., 944 F.2d 1287, 1304 (6th Cir.1991) (even though district court only considered bad faith in denying an award of attorney's fees, court would not remand for consideration of other four factors); Andrews v. Employers' Retirement Plan, 938 F.2d 1245, 1248 (11th Cir.1991) (holding that lack of bad faith was dispositive and reversed the fee award on that basis). Since the district court heard the evidence and is in the best position to judge the propriety of awarding fees, we cannot say that the district court abused its discretion in denying Nightingale's petition for attorney's fees.[5]
 
 
 59
 Nightingale requests that this court adopt a presumption that attorney's fees be awarded to the prevailing party in ERISA cases. We have previously expressly rejected this contention. "The law provides no presumption in favor of granting attorney's fees to a prevailing claimant in an ERISA action." Freeman, 996 F.2d at 1119; Dixon v. Seafarers' Welfare Plan, 878 F.2d at 1412. We decline Nightingale's self-serving invitation to make new law on this issue.[6]
 
 IV. CONCLUSION
 
 60
 The district court correctly determined that a conflict of interest existed in this case and that Blue Cross's denial of reimbursement was arbitrary and capricious. Therefore, the district court properly awarded judgment for Nightingale in Case No. 93-6867. Because the district court did not abuse its discretion in denying Nightingale's petition for attorney's fees, we affirm the district court's order in Case No. 93-6918.
 
 
 61
 AFFIRMED.
 
 
 
 *
 Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 By separate order, we consolidated these two cases for purposes of this appeal
 
 
 [2]
 Under Blue Cross's agreement with Intergraph, Blue Cross is paid a percentage of claims paid. Blue Cross receives no payment for claims that it denies. Although the Intergraph Plan is completely self-funded, it was drafted using a Blue Cross form according to the Blue Cross model
 
 
 [3]
 The district court referred to this relationship as "an incestuous situation." RII-75-9
 
 
 [4]
 Blue Cross's argument that contra proferentem should not apply to self-funded ERISA plans is specious. We held in Lee, 10 F.3d at 1551, that contra proferentem does apply to ERISA plans
 
 
 [5]
 Nightingale cites the recent case of McPherson v. Employees' Pension Plan of American Re-Insurance Co., 33 F.3d 253 (3rd Cir.1994), in support of its argument that fee awards can be justified when the defendant is culpable--even absent bad faith. However, we note that this case is not binding precedent on our circuit
 
 
 [6]
 Additionally, we note that only our court sitting en banc or the Supreme Court can overrule existing law in our circuit. Willis, Inc. v. Director, O.W.C.P., 31 F.3d 1112 (11th Cir.1994)