**MIDPOINT SERVICE PROVIDER, INC., Plaintiff,**

**v.**

**CONNECTICUT GENERAL LIFE INSURANCE COMPANY, Defendant.**

**No. 99 Civ. 2688 VM JCF.**

United States District Court, S.D. New York.

March 28, 2001.

---

Abraham Wax, Abraham Wax, PC, New York City.

Kevin J. Brennan, Dwyer & Brennan, New York City.

## MEMORANDUM AND ORDER

FRANCIS, United States Magistrate Judge.

The plaintiff, Midpoint Service Provider, Inc. ("Midpoint"), filed this case as a breach of contract action in New York State Supreme Court, New York County. The defendant, Connecticut General Life Insurance Company ("CGLIC"), removed it to this Court pursuant to 28 U.S.C. § 1441. Because Midpoint's claim arises under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, there is federal question jurisdiction. *See Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58, 62–64, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). The primary issue raised is whether, pursuant to an insurance policy issued by CGLIC, Midpoint's charges exceed the reasonable and customary fees for services rendered.

The parties consented to proceed before me for all purposes pursuant to 28 U.S.C. § 636(c), and I granted Midpoint's request to try the case solely on the papers submitted to the Court. This opinion constitutes my findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

*Background*

At all relevant times, Midpoint was a licensed home health care agency and a pharmacy. (Joint Pretrial Order ("PTO") at 3).[1] In May, June, and July 1998, Midpoint provided intravenous (IV) immunoglobulin therapy—which included drugs, nursing services, and medical supplies—to Robert Paulson at his home. (PTO at 3). Specifically, Mr. Paulson was treated with 30 grams of Gammagard per day for five consecutive days on three separate occasions. (PTO at 3). For the three treatments, Midpoint billed CGLIC, Mr. Paulson's insurance carrier, $28,408.03; $28,235.34; and $28,277.98 for a total of $84,871.35. (Compl. ¶¶ 1, 8; Midpoint Invoice covering treatment of Robert Paulson from May 4–9, 1998, June 1–5, 1998, and July 5–10, 1998 ("May Midpoint Invoice," "June Midpoint Invoice," and "July Midpoint Invoice," collectively the "Midpoint Invoices"), attached as Exh. C to Affidavit of Abraham Wax dated Aug. 8, 2000 ("Wax Aff."), included in Admin. Rec.). The great majority of the costs billed are attributable to Gammagard. (May Midpoint Invoice at 4; June Midpoint Invoice at 1; July Midpoint Invoice at 3). Of the total, Midpoint has collected $38,700.04, leaving $46,171.31 unpaid. (Compl. ¶¶ 10–11; Explanation of Benefits ("EOB") dated July 7, 1998, covering treatment received by Mr. Paulson in May and June 1998 ("July 7, 1998 EOB"); EOB dated Nov. 24, 1998, covering treatment received in May and June 1998 ("Nov. 24, 1998 EOB"); EOB dated Nov. 30, 1998, covering treatment received in July 1998 ("Nov. 30, 1998 EOB") (collectively the "EOBs"), attached as Exh. D to Wax Aff.).[2]

---

**1.** It appears from the record that Midpoint has ceased doing business in Manhattan. (Affidavit of Ronald Watson dated June 20, 2000 ("Watson Aff."), at 6, included in Documents Which Comprise the Administrative Record ("Admin. Rec.")).

**2.** In addition to the EOBs, the PTO recites the billed and owed amounts; however, it misstates the billed amount for two cycles of treatment ($28,408.00 and $28,277.98 instead of the correct figures $28,408.03 and $28,227.98), thus leading to an incorrect total figure ($84,921.32 instead of the accurate total of $84,871.35).

The defendant also stated in the PTO that it had only paid $35,999—in contrast to the plaintiff's complaint and the EOBs—but reserved the right to amend this amount. Accordingly, in the Defendant's Memorandum of

Mr. Paulson assigned all claims against CGLIC to Midpoint, and on February 8, 1999, Midpoint filed suit in state court for the remaining balance. (Compl. ¶ 5). On March 22, 1999, the action was removed to federal court. (Notice of Removal dated March 22, 1999).

On October 19, 1999, the defendant submitted a survey of 80 health care providers in New York City completed by Dianna Talento. (Dianna Talento's Report dated October 19, 1999 ("1st Talento Rep."), included in Admin. Rec.). Ms. Talento had questioned them about availability of home-based IV therapy and, in particular, price information for Gammagard treatment in 1998. Of those 80 providers, 10 offered such treatment and gave her pricing information for the relevant time period.[3] Some time after October 19, 1999, the parties sought an administrative review of the claims based on additional evidence submitted by both the plaintiff and the defendant. After communicating with the plaintiff, the defendant directed Ms. Talento to complete another report that discussed several issues raised by the plaintiff and included price information for an additional IV therapy provider identified by Midpoint. (Report dated May 11, 2000 ("2nd Talento Rep."), included in Admin. Rec.).

Based on, among other documents, the plaintiff's responses to interrogatories, the two surveys submitted by Ms. Talento, and correspondence between the parties' attorneys, the claim service manager for CGLIC denied any additional payment to the plaintiff, finding that the payments received by Midpoint were reasonable and customary. (Letter dated June 6, 2000,

from Helen Garde ("1st Garde letter") included in Admin. Rec.). Thereafter, the plaintiff and the defendant again submitted supplementary evidence, including a declaration from Ms. Talento that contained information about two more IV therapy providers, raising the number of agencies contacted who provide IV therapy to 13. (Declaration of Dianne Talento dated Sept. 14, 2000 ("Talento Decl."), included in Admin. Rec.). The claims service adjustor again refused any additional payment. (Letter dated September 15, 2000, from Helen Garde ("2nd Garde letter") included in Admin. Rec.).

*Discussion*

A. *Standard of Review*

■ A denial of benefits by an ERISA plan administrator is reviewed de novo by the court, "unless the benefit plan gives the administrator ... discretionary authority to determine eligibility for benefits or to construe terms of the plan," in which case the denial is reviewed under the more deferential "arbitrary and capricious standard." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 113–16, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *see also Miller v. United Welfare Fund,* 72 F.3d 1066, 1070 (2d Cir.1995).

Mr. Paulson's insurance policy with CGLIC excludes expenses "to the extent that they are more than Reasonable and Customary Charges." (Group Insurance Plan (the "Plan") at 52, included in Admin. Rec.). The policy further states that,

A charge will be considered as Reasonable and Customary if:

---

Law for Court's De Novo Review ("Def. Memo."), the defendant revised the amount paid to the plaintiff to $38,700.04.

3. Two of the ten providers, Advanced Care and Catholic Medical Center, could not furnish pricing information for 1998, but did supply figures for 1999, which will be considered along with the 1998 prices.

- it is the normal charge made by the provider for a similar service or supply; and
- it does not exceed the normal charge made by most providers of such service or supply in the geographic area where the service is received, as determined by [CGLIC].

To determine if a charge is Reasonable and Customary, the nature and severity of the Injury or Sickness being treated will be considered.

(Plan at 86).

The plaintiff argues that the Court should employ the de novo standard of review. While the "arbitrary and capricious" standard may be more appropriate owing to the discretion afforded CGLIC in the policy (Plan at 86) (a covered charge is that which is "the normal charge made by most providers ... *as determined by [CGLIC]*)" (emphasis added) *see C.N.S., Inc. v. Connecticut General Life Insurance Co.*, 9 F.Supp.2d 194, 195, 198–99 (E.D.N.Y.1998) (applying arbitrary and capricious standard to CGLIC policy), it is unnecessary to decide this issue, as Midpoint's claim fails even under the more exacting standard.

### B. *Merits*

■ Both parties agree that the primary issue to be decided is whether the plaintiff's charges meet the insurance poli-

cy's definition of reasonable and customary. (PTO at 2).[4] In addition, the plaintiff argues that: (1) Ms. Talento's surveys should not be considered by the Court because they were conducted after the case was initiated, and (2) CGLIC should accept the rates charged by Midpoint because of its failure to conduct an investigation before the litigation began. (Plaintiff's Memorandum of Law ("Pl. Memo.") at 1–4).

### 1. *Administrative Record*

■ The plaintiff contends that the Talento reports were not a part of the record when the claims administrator made her determination, and the Court therefore should not take them into consideration. This argument is without merit.

■ A court is limited to the administrative record absent a showing of good cause for admitting additional evidence. *DeFelice v. American International Life Assurance Co. of New York*, 112 F.3d 61, 66–67 (2d Cir.1997). In this case, the surveys are a part of the administrative record, despite the fact that they post-date the commencement of this litigation. Both Judge Marrero and I, as well as the parties, consented to the defendant's conducting an administrative review of Midpoint's charges while the case was pending and to the introduction of surveys as a part of the administrative record. (Letter from Kevin Brennan dated Feb. 9, 2000; Memo En-

---

**4.** The parties stipulated that the Court need not address the other issues set forth in the pleadings, including the plaintiff's alleged failure to exhaust administrative remedies in accordance with ERISA. (PTO at 2). Failure to exhaust, however, is a jurisdictional deficiency, and the court must dismiss the claim if the plaintiff has not pursued available means of redress. *See Kennedy v. Empire Blue Cross and Blue Shield*, 989 F.2d 588, 594 (2d Cir.1993); *Yoran v. Bronx–Lebanon Hospital Center*, No. 96 Civ. 2179, 1999 WL 378350, *7 (S.D.N.Y. June 10, 1999).

In this case, the Honorable Victor Marrero, to whom the case was previously assigned, permitted the parties to pursue administrative review of the charges while the case was pending. (Def. Memo. at 1). The claim service manager then twice reviewed the charges last year, and the administrative record that formed the basis of these reviews has been submitted to the Court. (1st and 2nd Garde letters; Admin. Rec.). Thus, the plaintiff has exhausted all administrative remedies.

dorsed Letter from Kevin Brennan dated June 8, 2000, both attached to Declaration of Kevin Brennan dated Oct. 30, 2000). Furthermore, CGLIC's claim service manager explicitly referenced Ms. Talento's reports when she denied additional payments to Midpoint, even though those reports were not available when CGLIC initially determined payment for the claims. Therefore, the surveys shall be considered by the Court because they form a part of the administrative record.

### 2. *Failure to Conduct an Investigation*

■ The plaintiff next argues that CGLIC must accept Midpoint's charges because it failed to conduct an investigation before the litigation began. Midpoint relies on state and federal caselaw and on state insurance law provisions that purportedly require an insurer to provide some evidence, or conduct an investigation, to support its denial of full coverage of a provider's rates. If the insurer does neither, the plaintiff contends, the insurer must fully compensate the provider at the rates charged.[5] Regardless of its validity, the plaintiff's argument does not apply to this case because the defendant conducted an investigation prior to the conclusion of the administrative review in which CGLIC

produced evidence that Midpoint's charges were not reasonable and customary. As stated previously, it is irrelevant that the investigation occurred after the commencement of the litigation, as it was consented to by the parties.

### 3. *Reasonable and Customary*

#### a. *Talento Reports*

■ The plaintiff contends that the Talento surveys are "so flawed that [they] provide[ ] no information that is useful for the Court," and that the Court should therefore find the plaintiff's charges reasonable and customary. (Pl. Memo. at 4–5). The evidence proffered by the defendant, while not overwhelming, amply supports its determination that Midpoint's charges were not reasonable and customary and that CGLIC adequately compensated Midpoint for the Gammagard treatments. By contrast, the plaintiff has not presented any concrete evidence to contradict the defendant's findings.

Of the thirteen agencies Ms. Talento contacted, the average cost in 1998 for 150gm of Gammagard (the amount Mr. Paulson received in one monthly treatment) was $11,778.46, or $35,335.48 for 450gm.[6] Most of these agencies charged

---

**5.** The plaintiff cites to the following cases: *Florence Nightingale Nursing Service, Inc. v. Blue Cross and Blue Shield of Alabama*, 41 F.3d 1476, 1482–83 (11th Cir.1995) (insurer must fully compensate provider for services where it submitted sufficient evidence of reasonable and customary nature of rates and insurer failed to present relevant evidence to the contrary in its survey); *Sansevera v. E.I. DuPont de Nemours & Co.*, 859 F.Supp. 106, 112–13 (S.D.N.Y.1994) (insurer never conducted investigation); *McLaughlin v. Connecticut General Life Insurance Co.*, 565 F.Supp. 434, 451 (N.D.Cal.1983) (under state law, insurer precluded from raising defenses which reasonable investigation would have uncovered); *Anonymous v. Monarch Life Insurance Co.*, 42 Misc.2d 308, 309–10, 247 N.Y.S.2d 894, 896–97 (Nassau County 1964) (claims

considered covered under policy for "usual and customary charges" where no evidence submitted by insurer as to why contested charges were not "usual and customary"); N.Y. Ins. Law § 2601(a) (insurers may be liable for "failing to adopt and implement reasonable standards for the prompt investigation of claims arising under its policies"); 11 N.Y.C.R.R. § 216.6 ("it shall be the duty of every insurer to offer claimant ... amounts which are fair and reasonable as shown by its investigation of the claim"). (Pl. Memo. at 3–4; Wax Aff. at 5–6).

**6.** CGLIC concedes that it paid Midpoint in full for nursing services and supplies, and that the only disputed charge is that for the drugs. (Def. Memo. at 4). Thus, this Court has con-

the Average Wholesale Price (AWP) [7] for Gammagard, whereas Midpoint charged two-and-one-half times the AWP. (1st and 2nd Talento Reps.; Talento Decl. at 6; May Midpoint Invoice at 3; June Midpoint Invoice at 1; July Midpoint Invoice at 3; Affidavit of Michael Farissier dated Aug. 8, 2000 ("Farissier Aff."), at 1, included in Admin. Rec.).

CGLIC has paid Midpoint $10,687.47, $12,831.70, and $13,222.02 for the therapy Mr. Paulson received in May, June, and July 1998.[8] This totals $36,741.19 for the 450gm of Gammagard administered to Mr. Paulson, a figure that surpasses the average amount charged by the surveyed providers by over $1,000.00. Additionally, the defendant may have overpaid by three times this amount. By covering the "normal charge made by *most* providers," the insurance policy implies that the mode,

rather than the mean, should be used to calculate the "normal charge." (Plan at 86) (emphasis added). Based on the information gathered by Ms. Talento, most of the providers billed at the AWP, which totals $33,165 for 450gm of Gammagard. Using this figure, CGLIC's payments to Midpoint exceeded the mode by more than $3,500.

Nevertheless, the plaintiff argues that Ms. Talento's reports should be discredited because of her affiliation with CIGNA, the parent company of CGLIC. (Wax Aff. at 2). Apart from this bald allegation, the plaintiff has not come forward with any evidence that the reports are biased. In the absence of proof to the contrary, then, the reports are persuasive evidence that Midpoint's charges exceeded the "the normal charge made by most providers" and thus were not reasonable and customary.

sidered the other agencies' price for Gammagard, and has not aggregated the cost for drugs, supplies, and nursing services.

The average is based on the following price information for 150 gm of Gammagard: Advanced Care, $15,000 ($3000/day); Catholic Medical Center, $11,055 ($737/10gm); Home Medical of America, $13,050 ($870/10gms); Infu Tech, Inc., $11,055 ($737/10gm); Town Total, $13,050 (870/10gm); Long Island Jewish Hospital, $12,525 (average of $770/10gm and $900/10gm); Mt. Sinai Home Care, $11,055 ($737/10gm); Visiting Nurse–New York, $11,055 ($737/10gm); PACG, Inc., $11,055 ($737/10gm); Bellevue Hospital Home Care, $11,055 ($737/10gm); Healix/Accuhealth, $11,055 ($737/10gm); Coram Healthcare, $11,055 ($737/10gm); Partners in Care, $11,055 ($737/10gm). (1st and 2nd Talento Reps.; Talento Decl. at 6). As stated previously, the figures for Advanced Care and Catholic Medical Center reflect the prices for 1999.

7. Neither CGLIC nor Midpoint determine the AWP for a drug. There are two independent listings, the Blue Book and the Red Book, which publish the AWPs for all medications based on the drug's National Drug Code. (1st Talento Rep. at 4; Affidavit of Arthur DeBoer dated Aug. 9, 2000 ("DeBoer Aff."), at 2,

included in Admin. Rec.). The AWPs frequently fluctuate. For example, from October 1996 to July 1998, the AWP for 10gm of Gammagard was $737.00, prior to that it was $640.71, and after July 1998, it rose to $870.00. (2nd Talento Rep., attachment).

8. CGLIC's payments for the Gammagard are derived from taking the total amount paid to Midpoint and subtracting the amount charged for supplies, which was paid in full. For the May treatment, CGLIC made two payments: one for $9,458.00 and another for $2,000.00. (July 7, 1998 and Nov. 24, 2000 EOBs). For the June treatment, CGLIC made two payments as well: one for $11,429.00 and another for $2,000.00. (July 7, 1998 and Nov. 24, 2000 EOBs). Finally, for the July treatment, CGLIC made one payment for $13,812.50. (Nov. 30, 1998 EOB). The costs for the supplies for the May, June, and July treatments are $770.53, $597.84, and $590.48 respectively. (Midpoint Invoices).

It is unclear how CGLIC was billed for the nursing services as they are not included in any of Midpoint's bills nor are they reflected in any of CGLIC's payments to Midpoint. (Midpoint Invoices; EOBs). Therefore, it must be assumed that nursing services were paid in some other fashion.

The plaintiff then raises several objections to Ms. Talento's findings. Midpoint contends that the not-for-profit providers should be eliminated because they can solicit funds from the public to mitigate losses, while private companies are forced to pass their expenses along to their consumers. (Wax Aff. at 5). Midpoint also urges that the geographic scope of any survey be limited to Manhattan because providers in other boroughs have differing prices. (Wax Aff. at 3–4). Nevertheless, if only the for-profit agencies in Manhattan are counted, the average cost for 150 gm of Gammagard in 1998 is $12,188.57, or $36,565.71 for 450gm, which is still below that paid to Midpoint by CGLIC.[9]

The plaintiff next argues that the paucity of providers included in Ms. Talento's reports renders them "insignificant statistically." [10] (Wax Aff. at 3). The plaintiff relies on *Florence Nightingale Nursing,* 41 F.3d at 1482, where the court found that Blue Cross' survey of seven agencies was "totally bereft of statistical significance." Blue Cross' survey, however, was found to be insignificant because it did not include agencies that provided services relevant to the disputed charge. *Id.* The Eleventh Circuit made clear that the size of the pool of providers contacted was not the focus of its determination, but rather whether the providers in the pool rendered similar services to those at issue. Indeed, the court rested its own decision on infor-

mation from only two agencies that provided nursing services comparable to those supplied to the claimant. *Id.* at 1482–83.

Midpoint further contends that the defendant failed to gather the proper information from the surveyed agencies. In particular, the plaintiff claims that the defendant neglected to request invoices and to disclose what questions were posed to the providers. (Pl. Memo. at 5). However, the plaintiff has not produced any specific evidence that would suggest that invoices from other providers would reflect billing practices different from those quoted by Ms. Talento, nor has it demonstrated that the precise questions asked of the providers had any bearing on Ms. Talento's findings.

Finally, Midpoint complains that the defendant should have inquired about whether the providers had agreements with Preferred Provider Organizations ("PPOs"). (Wax Aff. at 6; Pl. Memo. at 5).[11] Yet, Ms. Talento only asked for pricing information charged to insurance companies that did *not* have contract or volume discounts. (Talento Decl. at 3).

#### b. *Other Providers*

The plaintiff further alleges that there were twenty-eight companies in 1996 [12] that performed IV treatments but were not contacted by the defendant or Ms. Talento. (Wax Aff. at 3; Pl. Memo. at 5). This statement is simply erroneous. Ms.

9. This average reflects the prices provided by Advanced Care, Home Medical of America, Infu Tech, Inc., Town Total, Healix/Accuhealth, Coram Healthcare, and Partners in Care.

10. The plaintiff claims that Ms. Talento only contacted three for-profit agencies that were operating in Manhattan in 1998. (Wax Aff. at 3).

11. The plaintiff also enumerates many questions that it believes should have been asked

of Ms. Talento, such as "Did [the person questioned] ever see any bill[s]?" "Did they tell [Talento] if the pricing was put into the computer?" "Did they tell [Talento] that the prices were changed each year?" (Wax Aff. at 6–7). These questions are irrelevant and therefore were unnecessary.

12. The plaintiff relies on the 1996 roster of agencies affiliated with the National Association for Home Care. (Wax Aff. at 3). It is unclear why the 1998 roster was not used.

Talento had included in her first report fourteen of the twenty-eight agencies that the plaintiff claims were not contacted. (1st Talento Rep.). Subsequently, the defendant requested and received information from Ms. Talento about thirteen of the remaining fourteen providers excluding only Midpoint itself.[13] Her findings for all twenty-eight agencies are as follows: three IV providers were already included on the list of IV providers in her first report; two IV providers were added to the list; eighteen agencies did not provide either the IV treatment or the drugs (i.e. the agency only provided nursing services and contracted out with a pharmacy); three agencies no longer had working phone numbers; and one agency did not return a phone message. (Talento Decl. at 4–5, and attachment).[14]

The plaintiff also argues that another healthcare agency—Healix Healthcare—billed at the same rate for Gammagard did as Midpoint. (Letter from Abraham Wax dated April 17, 2000 ("Wax Letter"), included in Admin. Rec.). However, the invoice from Healix submitted by the plaintiff is immaterial because it lists the cost for a different drug.[15] Furthermore, even if Healix did charge more for Gammagard, the standard focuses on what the majority of providers bill, not the maximum amount ever charged. (Plan at 86).

### c. Plaintiff's Affidavits

The plaintiff has submitted four affidavits from individuals who have worked for IV treatment companies to support its contention that providers routinely charge two to three times the AWP for IV therapy drugs. (Affidavit of Leda Sternberg dated Feb. 18, 2000, included in Admin. Rec.; Watson Aff.; DeBoer Aff.; Farissier Aff.).[16] The affidavits, however, do not specifically address the billing practices for Gammagard by other providers of the therapy in 1998. For example, Arthur DeBoer states that Coram Healthcare, a company included in Ms. Talento's reports, charges "at least 3 times AWP on a national basis." But, Mr. DeBoer, who has been employed by Coram Health Care since 1999, adds that he is "not at liberty to disclose [Coram's] billing practices." (DeBoer Aff. at 2). These vague allegations do not refute the concrete and specific evidence compiled by Ms. Talento.

### d. Remaining Arguments

Finally, the plaintiff maintains that Midpoint billed other consumers at the same rate for Gammagard and that another insurance carrier paid the charges for Gammagard in full. (Wax Letter).

The first argument goes to the issue of whether the charge for Gammagard was

13. Ms. Talento also called several of the providers on the plaintiff's list that she had already contacted for the first report because the information she had on those providers was inconclusive. (Talento Decl. at 5).

14. Midpoint also claims that it had contacted seven agencies on its list of twenty-eight that were not included in the Talento Reports, and verified that they provided IV treatment. The plaintiff, however, fails to identify these providers and their prices for Gammagard in 1998.

15. The Healix invoice documents charges for Gamimune. (Wax Letter, attachment Bate stamped 13). According to the Blue Book, Gamimune, like Gammagard, is a gamma immu globulin. Gamimune, however, is a generic drug produced by Bayer Biologic, whereas Gammagard is a brand name drug produced by Hyland Laboratories. Both the price and dosing differ between the two drugs. (2nd Talento Rep. at 2 & attachment).

16. All of the providers included in Ms. Talento's reports charged the AWP for the relevant time period except for Advanced Care, Home Medical of America, Town Total, and Long Island Jewish Hospital, which all charged more. (1st Talento Rep. at 10; 2nd Talento Rep. at 2; Talento Decl. at 6)

Midpoint's "normal charge." However, the relevant inquiry in this case involves a determination of the normal charge for *most providers*. The second argument is equally unavailing. It is irrelevant whether another insurance company fully reimbursed Midpoint for Gammagard; the analysis turns on what providers charge, not what insurance companies cover. (Plan at 86).

*Conclusion*

For the reasons set forth above, I find that Midpoint has not demonstrated that its charges were reasonable and customary; rather CGLIC adequately compensated the plaintiff for the services rendered in connection with the treatment of Robert Paulson in 1998. Accordingly, the Clerk of Court shall enter judgment in favor of CGLIC dismissing the complaint.

SO ORDERED.